UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IMEDEQUIP, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 2:20-cv-683-GMB |
| PHARMACISTS MUTUAL INSURANCE COMPANY, | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

Plaintiff iMedEquip, LLC ("iMed") filed this lawsuit in the Circuit Court of Jefferson County, Alabama alleging claims for breach of contract and bad faith against Defendant Pharmacists Mutual Insurance Company ("PMIC"). Doc. 1-2 at 10–12.  PMIC timely removed the action to this court. Doc. 1.  Now under consideration is PMIC's motion for summary judgment on all claims. Doc. 33.  The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 16.  After careful consideration of the parties' submissions and the applicable law, and for the reasons that follow, the court concludes that the motion for summary judgment is due to be granted.

### **I. STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view

all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II. FACTUAL BACKGROUND

**A.     iMed**

iMed is durable medical equipment distributor. Doc. 34-2 at 4. iMed stores its inventory of durable medical equipment and related supplies primarily in its Birmingham, Alabama warehouse. Doc. 34-2 at 14. The Birmingham warehouse is 20,000 square feet, some of which is available for other companies to lease. Doc.

34-2 at 15.  Of iMed's portion of the warehouse, it uses 5,000 square feet for its corporate office, business office, light inventory, and some equipment, and the remaining space for inventory. Doc. 34-2 at 15.  The office and warehouse areas have designated entrances and are separated by a wall. Doc. 34-8 at 62.  iMed also stores inventory in various satellite warehouses. Doc. 34-2 at 18–22.

When iMed receives equipment from a supplier, its employees check the shipment by hand against the appropriate invoice, and then sign off on the bill of lading and packing slip. Doc. 34-2 at 28.  They then store the equipment in one of iMed's warehouses. Doc. 34-2 at 28.  When transferring an item from the Birmingham warehouse to a satellite warehouse, employees may exchange text messages, emails, or prepare notes based on visual inspections, but they do not prepare any formal documentation. Doc. 34-2 at 34.  In the same way, iMed does not have a company-wide system for tracking inventory while items simply remain in the same warehouse other than periodic visual observation. Docs. 34-8 at 15–16, 34-2 at 28 & 34-3 at 20.  Once equipment is distributed to patients or health care providers, technicians track deliveries and returns by manually recording the items' serial numbers on delivery and discharge tickets, which they upload to a cloud-based software system. Doc. 34-2 at 27 & 33.

**B.     The Missing Oxygen Concentrators**

Between August and September 2016, iMed began acquiring medical

equipment in preparation for some large hospice contracts. Doc. 34-7 at 2;[1] Doc. 34-8 at 67–8.  Specifically, iMed purchased approximately 300 oxygen concentrators, along with other items like mattresses and hospital beds. Docs. 34-2 at 22, 34-8 at 68 & 39-5.  iMed's order should have arrived in installments over time, but the supplier, Drive Medical, delivered a large shipment of supplies, including oxygen concentrators, during a shorter timeframe. Docs. 34-2 at 22, 34-8 at 5, 39-5 & 39-8.  As a result, iMed unexpectedly had to find room in its warehouse for these pallets of equipment. Docs. 34-2 at 31 & 34-8 at 5.  According to Lonnie Dorcey, iMed's owner, the Drive Medical delivery caused the warehouse to look like a "maze" where workers could not "see over the pallets" and had "only narrow rows to walk through." Doc. 34-2 at 31.

Dorcey did not routinely enter the warehouse because he did not have to walk through it on the way to his office (Doc. 34-8 at 64), but around the end of 2016 he periodically walked through the warehouse to observe inventory because of the disarray caused by the Drive Medical shipment. Doc. 34-3 at 20.  During one visit before leaving for Christmas break in 2016, Dorcey saw the oxygen concentrators in the warehouse. Doc. 34-3 at 20.

---

[1] On August 2, 2021, Lonnie Dorcey provided a recorded statement by telephone during PMIC's claims process (Doc. 34-7 at 2), and PMIC relied on the transcript of this statement in its motion for summary judgment. *E.g.*, Doc. 34 at 7 n.32.  Although unsworn, the court will consider this evidence because iMed has not objected to it.  Similarly, iMed has not objected to PMIC's reliance on unsworn claim notes. *See* Doc. 34-13.

5

Dorcey returned to the warehouse in January 2017 (Docs. 34-3 at 20 & 34-8 at 65) to "take stock of our oxygen concentrators" in preparation for fulfilling the new hospice contracts. Docs. 34-7 at 2, 34-8 at 67–68 & 34-9 at 34–35. He immediately noticed that "what should have been three hundred, roughly, concentrators, there was less than thirty." Doc. 34-8 at 68.[2] There is no evidence establishing precisely when the remaining oxygen concentrators went missing. Doc. 34-9 at 12. There was no sign of forced entry at the warehouse (Doc. 34-7 at 5), and none of iMed's employees were aware that a large amount of oxygen concentrators had gone missing until Dorcey noticed their absence. Doc. 34-8 at 78.

After his discovery, Dorcey called the police and reported the incident as a theft. Docs. 34-9 at 7 & 8–9 & 34-10. The police investigation closed without an arrest. Docs. 34-9 at 7 & 34-13. iMed did a physical inspection of the warehouse, searched delivery receipts, electronic records, and interviewed staff. Docs. 34-3 at 35 & 34-9 at 15. Dorcey reviewed historical records of the warehouse's alarm system but did not find anything of note. Doc. 34-8 at 60. To date, iMed has been unable to locate the missing oxygen concentrators. Docs. 34-8 at 79, 34-9 at 46 & 34-2 at 10.[3]

---

[2] When Dorcey provided his unsworn statement during PMIC's claims process, he recalled that "where we should have had roughly 300 concentrators in boxes, there were two." Doc. 34-7 at 2. The discrepancy in Dorcey's memory of the quantity of the remaining concentrators has no bearing on summary judgment.
[3] After filing suit, iMed has located three concentrators previously identified as missing by matching their serial numbers to delivery tickets. Docs. 34-26 & 39-8.

6

## C.     iMed's Insurance Claim

iMed filed an insurance claim with PMIC relating to the oxygen concentrators. Docs. 34-11 at 2 & 34-12 at 2. iMed is covered by PMIC's Business Owner's Policy ("BOP") and Inland Marine Floater ("IMF") policy. Doc. 34-14 at 1. The BOP is an all-risk policy for direct physical loss or damage to covered property on the insured premises. Doc. 34-16 at 23; Doc. 40-1 at 21 & 22. The IMF policy provides coverage for iMed's scheduled property. Doc. 34-17 at 13–14.

The parties do not dispute that the loss of the oxygen concentrators is covered by the BOP and IMF policies unless the Missing Property Exclusions contained in each policy apply to iMed's claims. The BOP exclusion states:

> "We" do not cover missing property where the only proof of loss is unexplained or mysterious disappearance, shortage discovered upon taking inventory, or any other instance where there is no physical evidence to show what happened to the property.

Doc. 34-16 at 26. Similarly, the IMF exclusion states:

> "We" do not pay for missing property where the only proof of loss is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the property.

Doc. 34-17 at 19. PMIC denied iMed's claims under both policies based on these exclusions (Docs. 34-14 & 39-11), concluding "that there is no physical evidence to show what happened to the missing property and that instead the shortage was discovered upon the conducting of an inventory." Doc 34-15 at 2.

## III.  DISCUSSION

At this stage in the proceedings, the court's only task it to determine whether iMed's loss of the concentrators is excluded from coverage under the PMIC policies. For the reasons to follow, the court finds that the missing property exclusions apply as a matter of law because iMed discovered the oxygen concentrator shortage while taking inventory and has offered no physical proof of what happened to the missing equipment.

Under Alabama law,[4] the burden is on the insured to prove that its loss is covered by the policy at issue. *E.g.*, *Pa. Nat. Mut. Cas. Ins. v. Roberts Bros., Inc.*, 550 F. Supp. 2d 1295, 1303 (S.D. Ala. 2008).  Where the insurer argues that coverage is barred by a policy exclusion, however, the insurer carries the burden of proving the applicability of the exclusion. *Id.*  The courts must construe insurance contracts in a manner that gives effect to the intentions of both parties. *Jay v. U.S. Auto. Assoc.*, 2021 WL 2492739, at *2 (Ala. June 18, 2021) (citing *Atty. Ins. Mut. of Ala., Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So. 2d 886, 870 (Ala. 1996)). Where the language of an exclusion is ambiguous, the court construes the exclusion narrowly "so as to limit the exclusion to the narrowest application reasonable under the wording." *Id.*

---

[4] Because this is a question of substantive law and not procedure, the court will apply Alabama law. *See Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (recognizing that "federal courts are to apply state substantive law and federal procedural law").

However, a difference of opinion on the interpretation of an exclusion does not make it ambiguous. *Id.* at *3 ("The fact that the parties interpret the insurance policy differently does not make the insurance policy ambiguous."); *see also Mid-Century Ins. Co. v. Watts*, 323 So. 2d 39, 50 (Ala. 2020) ("A policy is not made ambiguous by the fact that the parties interpret the policy differently or disagree as to the meaning of a written provision in a contract."). The language is ambiguous only if it is reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to its meaning. *Porterfield v. Audubon Indem. Co.*, 856 So. 2d 789, 799 (Ala. 2002). Clear and unambiguous provisions must be given their plain and commonly understood meanings. *Mid-Century*, 323 So. 2d at 49.

Here, the missing property exclusions are unambiguous because they are reasonably susceptible to only one construction. *See ACR Machine, Inc. v. Hartford Mut. Ins. Co.*, 2006 WL 1517293, at *3 (E.D. Pa. May 31, 2006) (finding that "taking inventory" is an unambiguous phrase as a matter of law); *Better Env., Inc. v. ITT Hartford Ins. Group*, 96 F. Supp. 2d 162, 168 (N.D.N.Y. 2000) (same). The BOP provision states that PMIC does not cover "missing property where the only proof of loss is . . . shortage discovered upon taking inventory." Doc. 34-16 at 26. The IMF provision uses the functionally identical phrase "shortage of property discovered on taking inventory." Doc. 34-17 at 19. An inventory is "an itemized list of current assets," such as "a list of goods on hand." *Inventory*, Merriam-Webster

Dictionary, available at https://www.merriam-webster.com/dictionary/inventory (last visited Feb. 2, 2022). In the business context then, "taking inventory" is making an itemized list of goods on hand. Therefore, the issue before the court is whether PMIC has shown that iMed's only proof of loss is a shortage discovered while making an itemized list of the oxygen concentrators on hand.

### A.   Taking Inventory

The court first finds that Dorcey made the discovery while taking inventory. Although they were delivered on a compressed timeline, iMed ordered such a large quantity of oxygen concentrators because it anticipated that it would need them to fulfill its hospice contracts. As the time for performance on those contracts approached, Dorcey decided to "take stock" of the oxygen concentrators in the Birmingham warehouse. To do so, he walked from his office space to the warehouse floor so that he could see how many concentrators iMed had on hand. If iMed had maintained an electronic system for tracking these items, Dorcey might not have needed to walk through the warehouse. But iMed had not implemented such a system, choosing instead to rely on periodic visual inspections for tracking the equipment stored in its warehouse. Upon arriving in the section of the warehouse where he had seen the oxygen concentrators only a few weeks before, Dorcey noticed that many of them were missing. Under these facts, the only reasonable interpretation is that Dorcey made this discovery while "taking inventory" within

the meaning of the missing property exclusions.

Although not binding on this court, the decision in *ACR Machine*, 2006 WL 1517293, supports this conclusion. In that case, the plaintiff, ACR Machine, operated a machine shop. *Id.* at *1. After a cancelled contract, ACR Machine had to store approximately 100 mechanical housings at the machine stop until it could locate a buyer. *Id.* A few months later, ACR Machine identified an aerospace company as a potential buyer for the mechanical housings. *Id.* at *2. When the aerospace company expressed interest, an ACR Machine employee went to the area in the shop where the housings had been stored to see how many were on hand and to confirm they had been completed. *Id.* at *3. He immediately realized that some of the housings were missing. *Id.* ACR Machine eventually determined that 61 mechanical housings were not accounted for, so it made a claim against its insurer, who denied the claim under an exclusion for "'[p]roperty that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory.'" *Id.* ACR Machine contended that its employee "'went to the area where the missing items were stored in an attempt to get them ready for an inspection by a potential buyer,' not to take inventory." *Id.* at *4 (quoting ACR Machine's brief). The court flatly rejected this claim, finding that the employee's purpose was "to count the number of mechanical housings and to determine the stage of machining for each piece—in other words, to take an inventory." There is no daylight between these

11

facts and those now before the court. Both employees conducted visual inspections for the specific purpose of determining the quantity of products on hand. Both were taking inventory when they discovered that some of those products were missing.

In an attempt to avoid this conclusion, iMed claims that Dorcey discovered the loss while he "was walking through the warehouse, not during a regularly scheduled, formal inventory," and that he did so "as a way to quantify iMed's loss, not to discover the loss." Doc. 40 at 26. This argument grafts an additional requirement onto the exclusionary language and mischaracterizes the record evidence. iMed relies on *Betco Scaffolds Company, Incorporated v. Houston United Casualty Insurance Company*, 29 S.W. 3d 341, 347 (Tx. Ct. App. 2000), for the proposition that Dorcey's inspection was not an inventory count unless it had been regularly scheduled or formalized in some way. The *Betco* court did find that the relevant insurance policy excluded "a loss or shortage which comes to the attention of the insured solely by reason of taking a regularly scheduled, *i.e.*, periodic, physical inventory," but the court had not been called upon to differentiate an informal or impromptu inventory from a scheduled and formal one. *Id.* Instead, the issue in *Betco* was the applicability of an exclusion for a "shortage disclosed upon taking inventory," *id.* at 345, when the plaintiff completed an investigation of two burglaries, initially elected not to make an insurance claim because it determined that the loss did not exceed its deductible, but two months later conducted an annual

inventory that revealed missing items of sufficient value to justify an insurance claim. *Id.* at 347. *Betco* thus lends no support to the claim that Dorcey's physical inspection could not have been an inventory count if it was not scheduled in advance or in some other way formalized. This is especially true when there is no evidence that iMed conducted regular inventories of the equipment stored in its warehouses other than visual inspections like Dorcey's. Moreover, the claim that Dorcey was quantifying a known loss cannot be reconciled with his testimony that he discovered the missing oxygen concentrators while walking through the warehouse and later confirmed that none of his employees had noticed they were missing. For all of these reasons, the court concludes that Dorcey was taking inventory when he discovered iMed's missing concentrators.

**B.     Physical Evidence**

Although iMed discovered its loss while taking inventory, the missing property exclusions do not apply unless the inventory count is iMed's "only proof of loss." Docs. 34-16 at 26 & 34-17 at 19. And the exclusionary language also makes clear that the policies consider a discovery while taking inventory to be an "instance where there is no physical evidence to show what happened to the property." Docs. 34-16 at 26 & 34-17 at 19. For this reason, the plain language of the exclusions requires iMed to come forward with some physical evidence to prove what happened to the concentrators.

The Eleventh Circuit's decision in *Seagull Enterprises, LLC v. Travelers Property Casualty Company of America*, 366 F. App'x 979 (11th Cir. 2010) (per curiam), is closely analogous. In that case, the insured, Seagull, filed an insurance claim after discovering that flooring supplies were missing from its warehouse. *Id.* at 980. Seagull claimed "that these items were stolen from the warehouse over the course of 2007, but [did] not know what exactly happened to the inventory, since there were no signs of breaking and entering, no damaged locks, and no broken doors or glass." *Id.* at 981. The insurer denied the claim under a missing property exclusion requiring "physical evidence to show what happened to the property," and the district court agreed that the exclusion applied. *Id.* at 980–81. On appeal, Seagull argued that "'physical evidence,' as used in the policy exclusion, can consist of the absence of massive items where the circumstances clearly point to theft" or the testimony of an employee "that he knew who stole some merchandise but refused to say who stole it." *Id.* at 981.

The Eleventh Circuit dispatched Seagull's "mere absence" argument, rejecting any claim that Seagull presented physical evidence of the disposition of the missing property "simply because the items are large—especially where, as here, the record shows that the items are consumable and did not have a specific location on the floor, indicating that they could have been misplaced, or even used." *Id.* The court further observed that Seagull "has offered nothing to show that [the

14

employee's] statement to the insurance investigators constitutes 'physical evidence,' under the plain meaning of the term," and contrasted the employee's unsworn and unrecorded statement with evidence like fingerprinting and photographs. *Id.* at 982 (citations omitted). Even so, the Eleventh Circuit considered the statement but observed that the employee also said "there was no way the large amount of product allegedly stolen could have been stolen, and if it was, it would have had to have been stolen over a period of time longer than a year, the amount of time in which Seagull alleges the flooring was taken." *Id.* at 981–82. The court thus found that "Seagull has not raised any issues of fact—beyond mere speculation—to suggest that there is 'physical evidence to show what happened to the [allegedly stolen] property.'" *Id.* (citation omitted).

To show that the oxygen concentrators were stolen, iMed relies on packing slips, bills of lading, invoices, delivery tickets, a spreadsheet identifying the location of the oxygen concentrators by serial number, photographs of the layout of the warehouse, and a police report. Docs. 34-10, 39-3, 39-4, 39-5, 39-6, 39-7, 39-8, 39-7, 39-8, 39-9 & 39-10, 40 at 17 & 40-1 at 23. iMed has not provided the court with any binding authority for the proposition that this documentary evidence amounts to physical evidence within the meaning of the policy exclusions. However, at least the photographs align with the Eleventh Circuit's interpretation of physical evidence in *Seagull Enterprises*, albeit in dicta. *See Seagull Enterprises, LLC*, 366 F. App'x

15

at 982 (noting the Supreme Court's definition of "real or physical evidence" in *Schmerber v. California*, 384 U.S. 757, 764 (1966), which included "fingerprinting, photographing, or measurements").

But the problem for iMed is not so much a lack of physical evidence as it is a lack of any evidence of what happened to its missing property. Even if this court were to consider the proffered documentary evidence, iMed has offered no more than "mere speculation" that the concentrators were stolen and not misplaced or used. *Id*. For all relevant purposes, iMed's evidence establishes only that it received the oxygen concentrators at its warehouse and later determined that they were gone. This is not enough. *See W.L. Petrey Wholesale Co., Inc. v. Great Am. Ins. Co.*, 622 F. App'x 849, 852 (11th Cir. 2015) (rejecting an insured's reliance on order and sales records without independent evidence of the disposition of the missing property). iMed may believe that it has been a victim of theft, but it has not come forward with any evidence of an unauthorized entry to its warehouse, forced or otherwise, that would support a reasonable inference of theft. *Cf. ACR Machine, Inc.*, 2006 WL 1517293, at *4 (finding evidence of theft based on testimony "that boxes which had previously contained mechanical housings were empty, that the alleged thieves had removed the castings and restacked the boxes to cover up the disappearance, and that the thieves only took the mechanical housings from the inside of the stacked pallets so that it was difficult to detect the loss"). iMed's evidence does not show with any

precision when the concentrators went missing, whether they disappeared in one day or over the weeks separating Dorcey's warehouse walkthroughs, or ultimately whether they were stolen at all. The court cannot conclude on these facts that iMed has created a fact question as to the applicability of the missing property exclusions.

Because iMed cannot show physical proof of loss independent of taking inventory, the missing property exclusions apply and there is no genuine dispute of fact as to iMed's claims for breach of contract. In addition, because PMIC has not breached its contracts with iMed, the claims for bad faith refusal to pay also must fail. *Crook v. Allstate Indem. Co.*, 314 So. 3d 1188, 1198 (Ala. 2020) (affirming summary judgment in favor of defendant on plaintiff's bad faith claim because defendant did not breach the policy).

## IV.  CONCLUSION

For these reasons, the court finds that Defendant's Motion for Summary Judgment (Doc. 33) is due to be granted. A final judgment will be entered.

DONE and ORDERED on February 7, 2022.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE